UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rodney Maki,                                                  File No. 22-cv-2887 (ECT/JFD)

         Plaintiff,

v.                                                           **OPINION AND ORDER**

Federal Reserve Bank of Minneapolis,

         Defendant.

Alexandra Howell, Austin Matthew Lysy, Douglas P. Seaton, Dustin Thomas Lujan, and James V.F. Dickey, Upper Midwest Law Center, Minnetonka, MN, and Harry N. Niska, CrossCastle PLLC, Anoka, MN, for Plaintiff Rodney Maki.

Jenny Gassman-Pines, Gina Tonn, and Michelle Erickson Morrow, Greene Espel PLLP, Minneapolis, MN, for Defendant Federal Reserve Bank of Minneapolis.

In July 2021, the Federal Reserve Bank of Minneapolis required its employees to be vaccinated against COVID-19. The policy allowed religious exemptions. Plaintiff Rodney Maki—one of the Bank's law enforcement officers—requested one, citing his opposition to vaccines linked to fetal stem cells. The Bank granted Mr. Maki a temporary accommodation but revoked it a few months later. In January 2022, Mr. Maki remained unvaccinated, and the Bank terminated him. Mr. Maki sued under Title VII of the Civil Rights Act of 1964 and the Religious Freedom Restoration Act (or "RFRA") for religious discrimination.

Both parties seek to exclude expert testimony. Mr. Maki seeks exclusion of the Bank's experts in their entirety. His motion will be denied. For the most part, the motion

identifies issues with the Bank's experts' proffered testimony that are more appropriately addressed through cross-examination. Though Mr. Maki has identified one reason to exclude a portion of the Bank's physician expert's testimony, the record at this stage does not permit a line to be drawn between testimony that should be excluded and testimony that should not. The Bank's narrower motion to exclude portions of Mr. Maki's expert will be granted.

Both parties also seek summary judgment. With respect to Title VII, neither summary-judgment motion will be granted because genuine factual disputes remain. A reasonable jury could find that accommodating Mr. Maki either would or would not cause the Bank to incur undue hardship. A reasonable jury also could find that Mr. Maki's objection to vaccination either was or was not based on a sincerely held religious belief. With respect to the RFRA claim, the Bank's summary judgment motion will be granted. The better answer is that, under controlling Eighth Circuit precedent, a federal employee cannot pursue a religious-discrimination claim under RFRA.

I

A

The Federal Reserve Bank of Minneapolis is a regional branch of the Federal Reserve Bank. ECF No. 55-1 at 2. It employs over 1,000 individuals. ECF No. 55-1 at 2. The Bank's mission is to support the United States economy. *See* ECF No. 56 at 79:2–7, 79:25–80:2; ECF No. 55-1 at 2 ("The Minneapolis Fed is part of our nation's central bank and is critical infrastructure that supports the basic functioning of the U.S.

2

economy.").  As part of that mission, the Bank enables payments, supervises regional banks, and supplies cash to ATMs.  ECF No. 55-1 at 2; ECF No. 56 at 164:1–3.

The Bank employs law enforcement officers to "protect and safeguard the premises, grounds, property, [and] personnel."  12 U.S.C. § 248(q)(1).  They are authorized "to carry firearms and make arrests without warrants for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States committed or being committed" on Bank buildings and grounds.  *Id.* § 248(q)(3).

The Bank employed Mr. Maki as a law enforcement officer.  The Bank hired him in June 1998.  ECF No. 71 ¶¶ 37–38.  He was promoted twice to higher ranking law enforcement positions.  *Id.* ¶¶ 40–41.  Mr. Maki remained a Bank law enforcement officer until his termination in January 2022.  *Id.* ¶¶ 42, 93.  Had his employment not been terminated, Mr. Maki was planning to continue working at the Bank until 2036, when he would reach the retirement age of 67.  *Id.* ¶¶ 2, 46.  When his employment was terminated, Mr. Maki was making a yearly salary over $60,000.  *Id.* ¶ 287.

Under the Bank's description of the position's essential functions, a law enforcement officer "is responsible for the protection of personnel, facilities, assets, and property within the area under the control and jurisdiction of the Bank."  ECF No. 55-2 at 2.  Specifically, an officer "[c]losely inspects credentials and identification of employees and visitors and ensures that only authorized personnel and vehicles are permitted access to the facility," "[u]ses electronic metal detectors and x-ray machines in the physical search of persons, packages, briefcases, luggage, etc. entering the building," "[m]ake[s] apprehensions when required," "[r]esponds to emergency and non-emergency calls for

service," and "[t]akes command at crime scenes or accidents and administers first aid as necessary." *Id.* Officers perform these tasks "[t]hrough rotating post assignments." *Id.* A law enforcement officer "must be physically and psychologically able to respond to any emergency occurring on the property under the control and jurisdiction of the Bank." *Id.* (listed under "Environmental and Other Conditions Required").

Law enforcement officers work in shifts, and some shifts require fewer officers. The day shift lasted from 6 a.m. to 2 p.m., the afternoon shift from 2 p.m. to 10 p.m., and the overnight shift from 10 p.m. to 6 a.m. ECF No. 60 at 21:25–22:10. In 2019, fifteen or sixteen officers worked the day shift, though the number could be as high as twenty-one, accounting for administrative positions. *Id.* at 28:21–29:10. Usually nine officers worked the afternoon shift, and eight were assigned to the overnight shift. *Id.* at 28:6–20.

An officer working the afternoon and overnight shifts interacted with fewer Bank employees and visitors than an officer on the day shift. ECF No. 71 ¶¶ 80, 207. The Bank is most crowded during the day shift and the first half of the afternoon shift; some "contractors and cleaning staff" are present during the second half of the afternoon shift, and "[v]ery few" people are present overnight. ECF No. 60 at 38:21–39:21. From February 2019 to January 2022, Mr. Maki worked the day shift, ECF No. 71 ¶ 52, though for overtime and emergencies he sometimes was scheduled for the night shift, *id.* ¶ 51.

The Bank generally assigned officers to a single shift upon hiring. ECF No. 60 at 48:8–20. When a position opened, the Bank "check[ed] with all the officers as to whether they desire to switch shifts." *Id.* at 48:14–16. Reassignment worked by seniority. *Id.* at 48:16–18. An officer who wanted to swap shifts was "typically kind of stuck," because

the Bank did not "force folks off of shifts because somebody has a personal issue in their life. They're usually stuck until an opening happens." *Id.* at 49:5–14. In his deposition, Bank Chief Federal Law Enforcement Officer Daniel Grendahl identified no economic costs for requiring officers to switch between shifts, but said the Bank had never done so. *Id.* at 49:15–50:1, 50:16–51:11. The record elsewhere points to difficulties in rearranging officer schedules. In October 2019, for example, owing to a request for a religious accommodation, an officer was scheduled not to work from Friday sundown to Saturday sundown and requested to move to the night shift. ECF No. 70-26 at 1 (showing Human Resources talking points in advance of a meeting with the officer); ECF No. 56 at 340:5–8. That Friday-Saturday accommodation was difficult for the Bank, as it "had to force other [officers] to work more weekend days, which are highly desired days off," and switching the officer to the night shift raised similar issues. ECF No. 70-26 at 1.

The Bank's law enforcement officers worked at several different posts. Some were single-officer posts; others required multiple officers. *See* ECF No. 71 ¶ 54; ECF No. 60 at 51:17–20. The number of officers assigned to a post corresponded roughly with the number of people in the post's area. *See* ECF No. 60 at 38:12–16 ("Each post has a different traffic pattern and volume."); *id.* at 58:19–23 (stating that more than one officer might be positioned at a certain post if it was a "high-traffic day"). For some posts, the number of assigned officers was flexible. ECF No. 58 at 188:7–17 (noting that Post 2, the "screening area for contractors" could be manned by four officers, though it "[u]sually had two").

Ordinarily, on-duty officers rotated through posts. ECF No. 55-2 at 2. It was possible to station an officer at one post for an entire shift, though the parties dispute the impact that decision would have on the Bank. *Compare* ECF No. 71 ¶ 56 ("[I]t is easy for the Bank to allow individual officers to stay at single-officer posts throughout full shifts."), *with* ECF No. 53 ¶ 4 ("It would be difficult and impractical for the Bank to allow a Law Enforcement Officer to work only single-officer posts.").[1] During discovery, the Bank identified no economic costs that would arise from keeping an officer at a single post throughout a shift. *See* ECF No. 60 at 37:18–38:1. The Bank asserts a single-post assignment would be difficult and impractical because officers must occasionally leave their posts to conduct essential job functions, like responding to emergencies. ECF No. 53 ¶¶ 5–6. The Bank also says that such a practice "would require excusing the Officer from [the] essential function of . . . rotating through all post assignments." *Id.* ¶ 4. Mr. Maki points out that officers did not rotate through shifts between June 2020 and January 2022.

---

[1]     Mr. Maki argues that the Grendahl Declaration [ECF No. 53] is a "sham" affidavit and should not be considered. ECF No. 86 at 7. He claims that Chief Grendahl's deposition testimony establishes "*no reason* why [officers] like [Mr.] Maki can't stay at a single post during a shift," so any reason provided in a later document is "a post-discovery attempt to inject a new 'essential function' into Maki's job description." *Id.* at 7–8. This is unpersuasive. Mr. Maki selectively quoted Chief Grendahl's deposition testimony. In context, Chief Grendahl was asked, "Any reason why [Mr. Maki] couldn't stay at the same post repeatedly instead of rotating throughout the shift?" He responded, "No. With the exception of he's going to interact with people, because he still has all the same core duties." ECF No. 60 at 37:20–38:1. In other words, Chief Grendahl immediately qualified his answer with an exception. The declaration further clarified that some of the remaining "core duties" were responding to safety emergencies and medical calls. ECF No. 53 ¶¶ 5–6. A clarifying declaration is not a sham affidavit. *See Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020).

ECF No. 71 ¶ 57. What is undisputed is that an officer would retain "the same core duties" while stationed at one post. *See* ECF No. 60 at 37:20–38:5.

As a law enforcement officer, Mr. Maki was responsible for responding to medical emergencies, which required him to be in close contact with other individuals. ECF No. 55-2 at 2; ECF No. 71 ¶ 71 (noting that he responded to "a few medical emergency calls" while employed by the Bank); ECF No. 58 at 34:6–9 (noting that providing CPR was a job requirement); ECF No. 58 at 47:2–5 (discussing administering first aid). In one instance, Mr. Maki received a medical call for an employee with a heart condition who was dizzy and breathing heavily. ECF No. 58 at 55:9–15. Mr. Maki provided hands-on emergency care. *Id.* 56:5–13 (testifying that he was within six feet of another person when he was "taking vitals" and "put[ting] on [a] blood pressure cuff"); ECF No. 71 ¶ 82. Medical emergencies occurred infrequently. *See* ECF No. 60 at 149:2–12 (stating that officers received between ten and twenty emergency calls each year). Similarly, officers responded to accidents, like a contractor falling off a ladder, though these situations happened even less frequently. *Id.* at 152:12–16, 153:8–12. Some officers were certified emergency medical technicians, and they were more likely to respond to medical emergency calls than non-certified officers like Mr. Maki. ECF No. 71 ¶ 75. Mr. Maki never responded to a medical emergency call by himself; there was always another officer present. *Id.* ¶ 76.

Another job duty that put Mr. Maki in close contact with other individuals was responding to security threats. *See* ECF No. 58 at 33:1–7 (noting that "takedowns, batons, [and] handcuffing" are necessary to the job); ECF No. 71 ¶ 70 (noting that officers "did respond to emergency and non-emergency calls, such as medical emergency calls, welfare

checks, and fires").  Officers like Mr. Maki "only have the authority to make citizens' arrests on [the] Bank campus for state law violations" and "contact local police to make arrests for most all [sic] crimes occurring on Bank premises."  ECF No. 71 ¶ 88.  While Mr. Maki never handcuffed or physically took someone to the ground while on duty, *id.* ¶¶ 91–92, he, together with another officer, apprehended one trespasser who scaled the Bank's wall.  ECF No. 58 at 60:10–61:18.

Officers also came into close contact with other individuals when "wanding" them. At certain posts, an individual entering the Bank passes through a metal detector.  *See* ECF No. 60 at 68:6–16.  If an entrant triggered the metal detector's alarm, an officer would stand near the individual and scan them with a hand-held wand.  *Id.* at 71:10–14.  For example, when contractors entered the building, they needed to be screened with the wand because their steel-toed boots set off the metal detector, though other visitors set off the alarm less regularly.  *See* ECF No. 71 ¶¶ 159, 164.

### B

When the COVID-19 pandemic arrived, the Bank made substantial changes to its basic operating procedures, including to the staffing and organization of law enforcement officers.  ECF No. 55-1 at 2.  Starting in March 2020, the Bank reduced the number of on-site employees to ten percent of its workforce; only law enforcement officers, members of the cash department, and facilities workers were allowed to work on the premises.  *Id.*; ECF No. 56 at 167:10–22.  The Bank did not allow visitors to enter.  *Id.* at 84:3–4. Employees on campus kept their distance and masked as much as possible.  *Id.* 313:17–18; ECF No. 58 at 133:9–19.

As a law enforcement officer, Mr. Maki was one of the "skeleton crew" who worked in person, starting in June 2020.  ECF No. 56 at 298:15–22; *see* ECF No. 71 ¶¶ 146–49 (noting that Mr. Maki was "on-call at home" from April to June 2020, and after June worked on site as an "essential on-site employee").  The Bank did not require Mr. Maki to participate in hands-on training for handcuffing and takedowns, but it continued to require him and other officers to do in-person gun training.  ECF No. 71 ¶¶ 65, 67.

From June 2020 to January 2022, Mr. Maki's role changed in several ways.  The Bank reduced both the number of posts and the use of the rotation system.  *Id.* ¶¶ 57–58.  Mr. Maki did not rotate through posts; rather, he stayed at one post for an entire shift.  *Id.* ¶ 150.  At times he worked a post alone, and at times he was joined by other officers.  *Id.* ¶ 157.  The Bank required Mr. Maki to mask and keep six feet away from other people, which he did.  ECF No 70-43 at 198:21–199:6; ECF No. 56 at 84:2–3; ECF No. 71 ¶¶ 82, 130.

Despite these protocols, Mr. Maki at times came into close contact with other individuals at the Bank.  Though fewer people visited the Bank from June 2020 to January 2022, Mr. Maki's post was at times particularly busy because of construction projects at the Bank.  ECF No. 71 ¶¶ 151–52, 162.  Mr. Maki screened construction workers at his post, sometimes by wanding them.  *Id.* ¶¶ 154, 156, 164.  He also responded to one emergency medical call, wearing a mask while in close contact with the individual who required assistance.  *Id.* ¶ 82; ECF No. 58 at 56:2–13.

C

On July 6, 2021, when COVID-19 vaccines were widely available in the United States, the Bank adopted a vaccination policy. *See* ECF No. 55-3 (policy); ECF No. 55-1 at 2–3 (explaining purposes for adopting the policy). Under the policy, "[a]s a condition of employment, every individual employed by the Bank must be fully vaccinated against COVID-19, as defined in applicable public health guidance, unless they receive an accommodation related to this requirement as provided below." ECF No. 55-3 at 2. Two reasons justified accommodations: medical conditions that precluded vaccination and sincerely held religious beliefs. *Id.* at 3. "Employees requesting an accommodation based on religious belief will receive a form to complete; they must clearly explain why receiving the COVID-19 vaccination would be contrary to the individual's religious beliefs and may be required to provide supporting information." *Id.*

The Bank instituted a slightly different policy for vendors, contractors, tenants, and "[c]ritical facility service visitors." *See* ECF No. 70-18; ECF No. 56 at 247:24–248:17. Vendors and contractors with "regular, ongoing onsite presence" were required to be vaccinated. ECF No. 70-18 at 1. This policy allowed accommodations for medical needs and sincerely-held religious beliefs. *Id.* "Project-based individuals" without a "regular, ongoing onsite presence" were exempt, though they were required to mask and physically distance. *Id.*; *see* ECF No. 56 at 240:23–25 ("[T]he contractors would be quite isolated by the nature of what their assignment was."). "Life safety visitors" were also exempt—these included police officers and medical responders. ECF No. 56 at 248:20–249:8, 250:13–16 (stating that transmission from unvaccinated firefighters was "still a concern," but "[i]n the

10

event we had a fire break out in the bank . . . you do what you've got to do to put the fire out."). Other visitors were not required to be vaccinated, though they were required to mask and maintain social distance. ECF No. 70-22 at 2 (showing visitor policy as of July 6, 2021); ECF No. 56 at 260:8–20 (affirming date of policy); ECF No. 70-81 at 2 (showing visitor policy as of August 4, 2021).

Bank President and CEO Neel Kashkari publicly explained the rationale for the vaccination policy in an article dated July 7, 2021. ECF No. 55-1. "In order to fulfill our public-service mission, we need more face-to-face contact than remote work allows, but there is no way for us to bring a critical mass of our staff back into our facilities and maintain social distancing." *Id.* at 2. Vaccination was necessary, he explained, if Bank employees were to return to in-person work:

> Even with our current high level of vaccinations, bringing everyone back into the office could put our staff at unnecessary risk. First, unvaccinated employees could infect other unvaccinated employees while at work; outbreaks continue to happen worldwide, largely among those who are unvaccinated. Second, some employees cannot be vaccinated due to health conditions. Those who can receive a vaccine but choose not to put these employees at unnecessary risk. Finally, some vaccinated staff have expressed concern about getting infected by an unvaccinated colleague and then passing it on to a family member who cannot be vaccinated. While there remains a lot that experts don't know about COVID-19, the science is clear that everyone's safety is enhanced the closer we can get our vaccination rate to 100 percent.

*Id.*

In his deposition, Mr. Kashkari identified three justifications for adopting the vaccination policy. First, because the Bank "provide[d] absolutely vital services on behalf

of the U.S. economy," ECF No. 56 at 79:1–2, it was important to bring employees back in person safely while continuing to support its mission, *id.* at 79:4–8. The second factor was "keeping all [the Bank's] employees safe." *Id.* at 80:2–3. Third, the Bank wanted to ensure that employees felt they could return safely. *Id.* at 80:3–13 (noting that people were still uncomfortable visiting restaurants and grocery stores at that point in the pandemic). Bank decisionmakers at times referred to "reputational risk" as a distinct justification for the policy. ECF No. 70-49 at 1.

The Bank understood when it adopted the vaccination policy that evidence for COVID-19 vaccines' impact on transmission of the virus was mixed. ECF No. 56 at 100:22–101:21 (recognizing "a lot of ambiguity in the science"). The Bank based its vaccination policy "first and foremost" on "keeping our staff safe from the worst health outcomes," *id.* at 101:4–6, and believed that "potentially it would help with spread," *id.* at 107:12–13; *see also id.* at 112:14–113:5 (stating that preventing spread "was a factor" but not as motivating as "protecting people's health outcomes"). The Bank concluded that vaccines reduced COVID-19 spread after speaking regularly with public health experts like Dr. Michael Osterholm and Dr. Tolar from the University of Minnesota, Dr. Julie Gerberding formerly from the Centers for Disease Control, and Tim Stenzel and Peggy Hamburg, then-current and former leaders at the Food and Drug Administration. ECF No. 56 at 102:11–104:3.

The Bank was more sanguine about the vaccines' ability to prevent recipients from contracting the virus and experiencing the worst health outcomes. *See id.* at 96:3–6, 113:1–2 ("[The vaccines] were very effective in protecting people's health outcomes."). An

article from the Occupational Health and Safety Administration, published in January and updated in August 2021, recommended that "vaccination is the most effective way to protect against severe illness or death from COVID-19," and that "employers consider adopting policies that require workers to get vaccinated or to undergo regular COVID-19 testing - in addition to mask wearing and physical distancing - if they remain unvaccinated." ECF No. 69-1 at 93–94, 100.  The parties do not dispute that the COVID-19 vaccines prevented infections and serious health outcomes.  *See* ECF No. 66 at 23 ("It is well established, of course, that people who are vaccinated against COVID are less likely to get sick or have serious symptoms (and also that COVID vaccination carried with it other health risks).").  The Bank also believed that, even if the vaccines were not very effective at preventing transmission, they still reduced the number of infected people.  *See* ECF No. 56 at 118:5–22 (recognizing that while vaccinated and unvaccinated individuals could both contract and spread COVID-19, the unvaccinated were experiencing worse health outcomes); ECF No. 70-82 at 3 (article emailed among Bank decisionmakers stating, "People who are vaccinated against COVID-19 are far less likely to be infected with the virus in the first place," which indirectly reduces transmission).

The parties' experts dispute whether, at the time the policy was in place, available scientific information supported the conclusion that vaccination effectively prevented and mitigated COVID-19 infection and transmission.  The Bank's expert, Dr. Frank Rhame, opines that "long COVID" is a serious health condition made more severe by acute COVID-19 infections; that vaccination is the most effective protection against COVID-19 infection and transmission; that masking and distancing, while less effective than

13

vaccination, also work to reduce transmission; and that a prior infection increases an individual's immunity. *See* ECF No. 45-2 at 9–24. Mr. Maki's expert, Dr. Peter McCullough, opines that the risk of asymptomatic COVID-19 spread is low, the available vaccines were ineffective at reducing transmission and presented serious health risks, and vaccination worsens the consequences of long COVID. ECF No. 45-1 at 10–32.

When the vaccination policy was instituted, the available COVID-19 vaccines used fetal cell lines in the testing process, and in the case of the Johnson & Johnson vaccine, in production and manufacture as well. *See* ECF No. 70-65 at 2; ECF No. 79-1 at 23 (noting that the Pfizer and Moderna vaccines used a fetal cell line during testing); ECF No. 71-6 at 2 (stating that all vaccines available in August 2021 used a fetal cell line in testing or production).

D

Until the Bank announced the vaccination policy, Mr. Maki had not received a COVID-19 vaccine or determined that his religious beliefs precluded him from doing so. He had refrained from vaccination for other reasons: He figured it was unnecessary given his good health overall, he was concerned about its "experimental use status," he did not regularly visit elderly or vulnerable people, and he had a general aversion to medical intervention. *See* ECF No. 70-43 at 129:21–131:25; ECF No. 71 ¶¶ 127–29.

Once the vaccination policy was announced on July 6, 2021, however, Mr. Maki began to research the COVID-19 vaccines, and he concluded that receiving one would violate his religious convictions. ECF No. 71 ¶¶ 131, 136. Mr. Maki is a Catholic Christian. *Id.* ¶¶ 95–96. He was baptized Catholic at birth, has practiced the faith all his

14

life, and has received the sacraments of Reconciliation, Communion, Confirmation, and Marriage. *Id.* ¶¶ 4, 95–97. His religious beliefs include that human life begins at conception, that abortion is the murder of an unborn baby and is morally wrong, and that it is sinful to make use of fetal cells derived from an abortion. *Id.* ¶¶ 109–11. These beliefs extend to medication and vaccines that used aborted fetal cells in any part of the process of development, manufacture, production, or testing. *Id.* ¶ 113. The night of July 6 he discovered that all the available vaccines were linked to fetal stem cells, though he "had not yet concluded [his] research." *Id.* ¶¶ 136–37; *see* ECF No. 70-43 at 137:10–138:2.

On July 7, 2021, Mr. Maki requested an accommodation through the process provided by the vaccination policy. *See* ECF No. 55-3 at 3; ECF No. 71 ¶ 137. He submitted a separate written request on July 13, 2021, explaining that he had a sincere religious objection to receiving a vaccine tested, produced, or manufactured using a fetal cell line resulting from an abortion. ECF No. 55-4 at 2. The Bank received his accommodation request and scheduled a meeting between Mr. Maki and Human Resources on July 27 to discuss the request. *See* ECF No. 71 ¶ 172; ECF No. 92 ¶ 3; ECF No. 92-1 (audio from meeting). At that meeting Mr. Maki reiterated his religious objection to receiving a COVID-19 vaccination, explaining that he did not want to benefit from a vaccine linked to an abortion. ECF No. 92-1.

Some of Mr. Maki's statements during this meeting were false or omitted information. For example, Mr. Maki claimed he had not been vaccinated since childhood. *Id.* at 6:20–6:25. That was incorrect; he was vaccinated as an adult for MMR in 1990, Hepatitis B in 1996, and TDAP in 1985, 1996, 2005, and 2020. ECF No. 55-5 at 4. He

was asked whether any religious leaders in his parish provided guidance on vaccines.  ECF No. 92-1 at 4:55–5:07.  Mr. Maki said that they were pro-life,[2] but he did not disclose that his parish website linked to a statement from the United States Conference of Catholic Bishops explaining that Catholics were morally justified in taking COVID-19 vaccines, despite the connection to fetal stem cells.  ECF No. 92-1 at 5:07–5:22; ECF No. 92-2 (showing bishops' statement).  Mr. Maki also gave conflicting statements about his willingness to take a COVID-19 vaccine that did not use fetal stem cells in testing or production; at his accommodation meeting he said he would "not be opposed to it," but in his deposition he testified that he was unsure if he would do so.  ECF No. 92-1 at 3:43–4:05; ECF No 70-43 at 173:12–174:9.

The Bank temporarily granted Mr. Maki's accommodation request on August 6, 2021.  *See* ECF No. 55-6 at 2.  It did not "reach any judgments" regarding Mr. Maki's sincerity; it "just took [him] at [his] word."  ECF No. 56 at 185:18–21.  Mr. Maki was to

---

[2]     The full exchange was as follows:

> Q: Do you attend a . . . specific church?
>
> Mr. Maki: Yes, I do.  I'm a member of my parish that I attend weekly.
>
> Q: Okay.  And has your parish or any of the religious leaders in your faith tradition—have they issued any guidance on vaccines from your congregation?
>
> Mr. Maki: Absolutely.  I mean, like I said, they're pro-life.  And they brought some of these things to our attention. . . . That . . . these fetal cell lines are being used.

ECF No. 92-1 at 4:40–5:22 (lightly edited for clarity).

"comply with all Bank health and safety measures," including masking and social distancing while on the Bank's premises. ECF No. 55-6 at 2. The Bank emphasized that "[t]his accommodation is temporary; when there is a vaccine available that does not use fetal cell lines in testing and/or production, you will be expected to receive vaccination." *Id.* It continued, "[t]he Bank reserves the right to revisit this accommodation at any time and to make any changes warranted by evolving circumstances, including public health guidance, local conditions or Bank needs." *Id.* In a November 5 email, the Bank added more requirements to Mr. Maki's accommodation—he could not eat in the cafeteria or use the fitness center. ECF No. 71-7 at 1. Mr. Maki complied with all the requirements while under temporary accommodation. ECF No. 71 ¶¶ 180, 188.

The Bank also told Mr. Maki about an option it ultimately chose not to provide— mandatory weekly testing instead of vaccination. The Bank explained in the November 5 email that it would implement a "testing requirement for unvaccinated employees where you will be required to be tested for COVID on a weekly basis." ECF No. 71-7 at 2; *see* ECF No. 71 ¶ 187. But the Bank never implemented a testing alternative to its vaccination requirement. In his deposition, Mr. Kashkari was asked whether the Bank viewed the combination of "masking, testing, and physical distancing" to be superior to vaccination at stopping the spread of COVID-19; he did not respond yes or no but testified that the vaccine was motivated by the need to keep everybody in the Bank safe. ECF No. 56 at 189:11– 191:9. In context, Occupational Safety and Health Administration guidance updated August 13, 2021, recommended that "employers consider adopting policies that require

workers to get vaccinated or to undergo regular COVID-19 testing—in addition to mask wearing and physical distancing—if they remain unvaccinated."  ECF No. 69-1 at 94, 100.

In December 2021, the Bank revisited its vaccination policy exemptions.  The Bank explained that two reasons motivated the change: "first and foremost, returning all of our employees back to the bank . . . would move us from a skeletal operation to a fully staffed operation and change the risk profile" of its business; and second, an unvaccinated law enforcement officer died from COVID-19.  ECF No. 56 at 308:2–12.  By this time, the great majority of Bank employees had been vaccinated—as Mr. Kashkari wrote in an email on August 16, 2021, "[o]f our 1,100 employees, only a handful resigned or retired early because of the mandate.  97% are now fully vaccinated or have gotten a first shot."  ECF No. 70-55.

On December 16, 2021, the Bank told Mr. Maki that it would be revoking his temporary accommodation unless he received a COVID-19 vaccine by January 7, 2022.  ECF No. 71-8 at 2.  January 10 was the date many Bank employes were scheduled to return to in-person work.  ECF No. 55-8 at 2.  The Bank's revocation letter explained that "[a]s more employees return to the Bank's premises, [Mr. Maki's] business need to have close contact with a significant number of individuals will increase."  ECF No. 71-8 at 1; *see also* ECF No. 56 at 300:9–17 (stating that officers were not accommodated because of the risk to "[t]heir health and safety, the health and safety of their colleagues, the health and safety of visitors, everybody in the bank, and how . . . we maintain our full operations"); ECF No. 70-14 at 1 ("[Mr. Maki's] [a]ccomodation [sic] is unduly burdensome because of job duties, physical workspace, and return of people to the premises.").  In the Bank's view,

the law-enforcement-officer role required Mr. Maki to be in close contact with other people, including during emergency responses. ECF No. 71-8 at 1. Training exercises also required "close proximity to other employees." *Id.* at 2. Because he could not "consistently maintain physical distancing while performing the essential functions of [his] role," the Bank determined that continuing to accommodate him would be an undue hardship. *Id.*

The Bank invited Mr. Maki to apply for open positions where an accommodation might be possible. *Id.*; ECF No. 71 ¶ 193. Mr. Maki inquired about two positions but was told that both involved close contact with other individuals, so the Bank would not be able to provide him with an accommodation in those roles. ECF No. 71 ¶¶ 194–95, 200. The Bank encouraged Mr. Maki to apply for a job in technical support, but Mr. Maki did not pursue it because he was unqualified. ECF No. 72-1 at 5; ECF No. 71 ¶¶ 201–03.

At the time it denied Mr. Maki's accommodation request, the Bank granted accommodations to several other employees, namely an attorney, a human resources consultant, an IT director, and a business analyst. ECF No. 70-14 at 2. The Bank noted that, for each of them, "[a]ccomodation [sic] is likely possible given job duties and physical workspace." *Id.* These individuals' essential functions involved meeting other people in one-on-one and group settings, and the Bank still required them to mask and maintain physical distance. *See* ECF Nos. 70-68 at 1, 70-69 at 1, 70-70 at 1, 70-71 at 1. The record nowhere indicates that an essential function of any of their roles required them to be within six feet of another person.

19

In the weeks leading up to January 7, 2022, Mr. Maki tried to negotiate a vaccination alternative.  On January 4, Mr. Maki requested to extend his accommodation until February 7, as the mass "return to bank" had been delayed by a month.  ECF No. 72-1 at 1–2; ECF No. 71 ¶ 204; ECF No. 56 at 305:17–306:14.  The Bank denied his request, stating that "there are many essential functions of the [officer] position, regardless of shift, that cannot be done while consistently masking and maintaining six feet of physical distance, which is the applicable public health guidance for unvaccinated persons."  ECF No. 72-1 at 1.  Mr. Maki also offered to swap shifts with other officers; he knew some were willing to trade with him.  ECF No. 71 ¶ 208.  But the Bank "determined that it was unable to extend [his] accommodation, regardless of shift."  ECF No. 71 ¶¶ 206–10; ECF No. 72-1 at 1.  Mr. Maki was willing to undergo regular testing and to mask at work, but the Bank did not institute these alternatives.  ECF No. 71 ¶ 215.

By January 7, Mr. Maki had not received a COVID-19 vaccination, so the Bank placed him on a two-week leave of absence.  ECF No. 71-10 at 2.  In those two weeks he did not get vaccinated.  *Id.*  On January 21, the Bank terminated Mr. Maki's employment for non-compliance with the vaccination policy.  *Id.*

After he was terminated, Mr. Maki began applying for new jobs in March 2022.  ECF No. 71 ¶ 225.  In March 2023 he accepted an offer from Metro Transit as a police officer, but he resigned from the position two months later, citing concerns about learning and applying new policing techniques, his age, the lack of back-up officers, and increased stress and danger.  *Id.* ¶¶ 246, 248, 258, 273, 276, 279.  In total Mr. Maki applied for at least eighty-seven jobs since January 2022.  *Id.* ¶ 226.

20

E

Mr. Maki brings two causes of action. He claims that the Bank's actions violate the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, and constitute employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

II

Federal Rule of Evidence 702 governs the admissibility of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–94 (1993). District courts have "wide latitude in determining whether an expert's testimony is reliable." *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) (citation omitted). If the expert evidence is reliable and relevant, "no single requirement for admissibility" governs. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). "As a general rule, the factual basis of an expert opinion goes to the credibility of the

testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Id.* at 929–30. The proponent of the expert opinion bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies Rule 702. *Khoury*, 614 F.3d at 892 (citations omitted).

A

Mr. Maki moves to exclude the Bank's two experts. ECF No. 76 at 1. He argues that Dr. Frank Rhame's testimony regarding the effectiveness of vaccines on COVID-19 infection and transmission is irrelevant to the Bank's undue hardship defense and describes scientific opinions the Bank never consulted while it developed its vaccination policy. *Id.* at 5. He argues that Jennifer Bey's report regarding Mr. Maki's job search is unreliable and irrelevant because it is speculative, disconnected from the facts of the case, based on a misunderstanding of the relevant job market, and self-contradictory. *Id.*

1

Dr. Rhame is a medical doctor with board certifications in internal medicine and infectious diseases. ECF No. 45-2 at 2. He studied at Stanford University and directed the Hospital Infection Control Program at the University of Minnesota. *Id.* He is an Adjunct Professor of Medicine at the University of Minnesota and is a fellow of the Infectious Diseases Society of America. *Id.* at 2–3. He has presented over twenty lectures on COVID-19 and testified as an expert in two trials. *Id.* at 3–4.

22

As I understand it, there are two basic aspects to Mr. Maki's argument that Dr. Rhame's opinions should be excluded. The first is that Dr. Rhame addresses many scientific aspects of COVID-19, but "COVID-19 is not on trial in this case." ECF No. 76 at 5. This argument is not persuasive. In developing its vaccination policy and in determining not to grant Mr. Maki's requested accommodation, the Bank accounted for a variety of scientific information regarding COVID-19, the disease's impact on its employees and operations, and the efficacy of vaccines or other measures in addressing these impacts. Dr. Rhame's proffered testimony will assist the jury in understanding this information. *See* ECF No. 79-1 at 8–13 ("Vaccination Is the Most Effective Method to Protect Individuals from COVID-19 Infection & Reduce Transmission of COVID-19"), 14–18 ("Impact of COVID-19 Vaccination on SARS CoV-2 Infection & Transmission"), 18–21 ("In Addition to Vaccination, Social Distancing and Barriers Are Also Important Measures for Reducing Transmission of SARS-CoV-2").

The second aspect to Mr. Maki's argument is that Dr. Rhame's proffered testimony would concern information the Bank never considered in developing its policy or refusing the requested accommodation. In the abstract, this argument is convincing. As the Seventh Circuit has persuasively explained, information not known to an employer when it decides not to accommodate an employee is irrelevant to determining whether granting the requested accommodation would impose an undue hardship on the employer. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023), *vacated on denial of*

*reh'g*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023);[3] *see Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1152 (D. Or. 2024) ("To judge an employer's undue hardship decision based on knowledge and information developed after the fact would hold that employer to an impossible standard. Courts would be tasked with judging an employer's decision with the benefit of hindsight, irrespective of factors like the consensus of reputable organizations, the evolving nature of a situation, and the type and quality of information available at the time."). The problem with this aspect of Mr. Maki's motion is that he has not identified those precise aspects of Dr. Rhame's proffered testimony that rely on information the Bank did not have in January 2022 or before. Without a more specific description, it is not possible to grant Mr. Maki's motion now. Dr. Rhame will be allowed to testify. If Mr. Maki can identify specific portions of Dr. Rhame's proffered testimony that rely on information the Bank did not have in adopting its vaccination policy and denying the requested accommodation, he is invited to file a motion in limine to address those issues before trial.

2

Mr. Maki moves to exclude Ms. Bey's testimony. ECF No. 76 at 12–34. Ms. Bey is a vocational expert and owner of Bey & Dyer. ECF No. 84 ¶ 2. She has a B.S. in Psychology from the University of Wisconsin–River Falls and a Master's in Rehabilitation Counseling from Illinois Institute of Technology. ECF No. 79-1 at 31. Ms. Bey has over

---

[3]    *Kluge* was vacated and remanded following *Groff v. DeJoy*, 600 U.S. 447 (2023). The vacatur and remand did not concern this aspect of the Seventh Circuit's decision, and it remains persuasive.

twenty years of experience in the field, *id.*, and has testified or been deposed as an expert in thirty-four cases from 2017 to 2024, not counting this matter, *id.* at 46–47. In preparation for her report, she reviewed and relied on "the Complaint, Mr. Maki's discovery responses, Federal Reserve Bank employment, pay and benefits documents, Metro Transit position documents, Mr. Maki's job application documents, Federal Reserve Bank retirement plan documents, Mr. Maki's resumes, and the transcript and video clips of Mr. Maki's deposition." *Id.* at 31.

Ms. Bey opines that the Metro Transit position was comparable to the Bank's law enforcement officer role, there is high demand for comparable positions in the Minneapolis metro area, Mr. Maki did not make a reasonable effort to obtain subsequent employment, and Mr. Maki's projected retirement age of 67 is not reasonable. *Id.* at 34–41. These opinions are relevant to whether Mr. Maki mitigated damages from his termination by diligently seeking a comparable job. *See Mathieu v. Gopher News Co.*, 273 F.3d 769, 784 (8th Cir. 2001).

Mr. Maki argues that Ms. Bey's opinions should be excluded in their entirety. His objections can be grouped into essentially four categories. He argues that Ms. Bey's analysis is too superficial and non-technical to assist the trier of fact, lacks sufficient factual bases, is not the product of reliable principles or methods and fails to apply reliable methods to the facts, and opines on legal matters. ECF No. 76 at 13; *see* Fed. R. Evid. 702. Each of these will be considered in turn.

Mr. Maki argues that Ms. Bey is not offering specialized knowledge, but rather a cursory and superficial analysis within the jury's capabilities. ECF No. 76 at 14–16. For

example, her comparison of the officer positions at the Bank and at Metro Transit consists of reviewing the posted job descriptions, which Mr. Maki uncivilly refers to as "reading comprehension." *Id.* at 17. "Where the subject matter is within the knowledge or experience of laymen, expert testimony is superfluous." *United States v. French*, 12 F.3d 114, 116 (8th Cir. 1993) (quoting *Bartak v. Bell-Galvardt & Wells, Inc.*, 629 F.2d 523, 530 (8th Cir. 1980)). At the same time, expert testimony can illuminate a job's responsibilities because "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006); *Roggenkamp v. Colvin*, Civ. No. 13-572, 2013 WL 5931551, at *19 (W.D. Pa. Nov. 5, 2013) ("The primary function of vocational expert testimony is to supplement generic job descriptions with information about what employers in the national economy actually expect of their employees on a day-to-day basis."). Ms. Bey's proffered testimony falls in the latter category. She does not merely repeat written job descriptions or compare them as a layperson might. She analyzes Mr. Maki's deposition testimony in relation to his work for both employers. This testimony seems likely to be helpful in the way *Garcetti* described. It will not be excluded on this ground.

Mr. Maki argues that Ms. Bey's opinions lack sufficient factual bases. For example, to opine on the law enforcement and security labor market, she compared website job descriptions, and to determine whether Mr. Maki would be subject to age discrimination, she spoke to one police chief. ECF No. 76 at 14, 16. Ms. Bey's salary-comparison analysis is deficient for similar reasons, he argues—she "does not address Maki's testimony, nor does she identify what most of the security jobs' benefits packages might entail, and how

they would compare with Maki's benefits at the Bank." *Id.* at 23. This is not a ground for exclusion. The Eighth Circuit has "stated numerous times that, '[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.'" *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 778 (8th Cir. 2021) (quoting *United States v. Coutentos*, 651 F.3d 809, 820 (8th Cir. 2011)). Inadequate factual support justifies exclusion when the testimony is "wholly speculative," but otherwise, "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means' of addressing 'shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596). The issues Mr. Maki has identified are cross-examination-worthy, not exclusion-prompting.

Mr. Maki argues that Ms. Bey's methodology is inadequate to determine the reasonableness of a job search. ECF No. 76 at 29–31; *see Daubert*, 509 U.S. at 592–93 (requiring courts to assess "whether the reasoning or methodology underlying the testimony is scientifically valid"). "[T]o the extent that she relies primarily on her experience, she does not 'explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts . . . .'" ECF No. 76 at 13 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Courts should exclude opinions grounded in subjective methodologies, and "the suggested scientific testimony must 'fit' the issue to which the expert is testifying." *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994) (quoting *Porter v. Whitehall Lab'ys, Inc.*, 9 F.3d 607, 613 (7th Cir.

1993)).   Here, Ms. Bey's proffered testimony draws on her vocational counseling experience, describes tangible steps an applicant can take to pursue employment, and offers an expected timeframe to gain a licensed position.   ECF No. 79-1 at 38.   Ms. Bey's methodology may be open to question on cross-examination, but it does not incorporate an insufficient methodology.

Mr. Maki argues that Ms. Bey will inappropriately opine on legal matters if she testifies as proffered that Mr. Maki's job search was not a reasonable and diligent effort. ECF No. 76 at 27–28.   This is incorrect.   The reasonableness of a job search for purposes of mitigating damages is a fact question for the jury, as Mr. Maki's cited authorities confirm.   *See Jackson v. Shell Oil Co.*, 702 F.2d 197, 202 (9th Cir. 1983); *Belk v. Mo. Highways & Transp. Comm'n*, No. 06-4251-CV-C-SOW, 2009 WL 10679080, at *9 (W.D. Mo. Apr. 27, 2009); *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 696 (2d Cir. 1998). Ms. Bey's opinion embraces an ultimate issue with respect to damages, but this is consistent with the Rules.   Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue.").

## B

Mr. Maki's expert rebuttal witness is Dr. Peter McCullough.   Dr. McCullough has a medical degree from the University of Texas Southwestern Medical School in Dallas. ECF No. 45-1 at 2.   He completed a master's degree in public health in the field of epidemiology at the University of Michigan.   *Id.*   He has published frequently in medical journals and provided testimony on government panels on the response to the COVID-19 pandemic.   *Id.* at 3–5.   The thrust of his proffered testimony is that Dr. Rhame's opinions

28

about COVID-19 vaccines "are not expert or reliable." *Id.* at 8.  He would rebut Dr. Rhame's testimony on the risk of asymptomatic spread, the effectiveness of COVID-19 vaccination, and the health concerns of Long COVID.  *Id.* at 10–32.

The Bank seeks to exclude only "the narrow portion of Dr. McCullough's opinion related to vaccine requirements and exemptions or accommodations to such requirements." ECF No. 44 at 3.  Dr. McCullough would testify, for example, that "a position supporting or mandating COVID-19 vaccination goes against good medical practice and cannot be backed by ethical and prudent physicians, public health agencies, schools, or employers." ECF No. 45-1 at 15.  And again, "the COVID-19 vaccines have never been sufficiently protective against contracting COVID-19 to support their use beyond voluntary participation." *Id.* at 15–16.  The Bank argues that these statements exceed the boundaries of acceptable expert testimony in three ways: they are outside Dr. McCullough's expertise; they constitute legal opinions; and they are irrelevant.  ECF No. 44 at 2–3.

An expert may not testify outside his expertise.  Federal Rule of Evidence 702 allows testimony from "the expert's scientific, technical, or other specialized knowledge" that is "based on sufficient facts and data" and "the product of reliable principles and methods" that have been reliably applied.  Fed. R. Evid. 702; *see Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001).  Where these statements implicate professional ethics or duties, expert witnesses may present opinions within their specialized knowledge of those areas.  *See Dixon v. Grand Trunk W. R.R. Co.*, 259 F. Supp. 3d 702, 712 (E.D. Mich. 2016) (admitting expert testimony that defendant's ergonomic practices fell short of industry standards based on regulatory and trade

publications).  But where "the area of the witness's competence" does not "match[] the subject matter of the witness's testimony," the opinion must be excluded.  *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) (quoting Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6265 (1st ed. 1997)).  Where the "analytical gap" between the area of expertise and the area of testimony is too great, courts exclude the opinion.  *See Kruszka v. Novartis Pharms. Corp.*, 28 F. Supp. 3d 920, 929 (D. Minn. 2014).

The parties disagree whether Dr. McCullough is qualified to testify regarding the appropriateness of employer responses to the COVID-19 pandemic.  The Bank argues that, while Dr. McCullough may testify regarding the medical response to COVID-19, Dr. McCullough goes too far when he opines that vaccination "cannot be backed by ethical and prudent . . . employers."  ECF No. 44 at 7 (quoting ECF No. 45-1 at 15).  In the Bank's view, because Dr. McCullough's credentials lack "expertise in employer-employee issues or employment policy and personnel decisions," that testimony lies outside his specialized knowledge.  *Id.*  Because "testimony from a medical expert about business prudence is . . . improper," it should be excluded, the Bank argues.  ECF No. 98 at 8.  Mr. Maki concedes that Dr. McCullough has no basis to testify regarding what might be "ethical."  ECF No. 82 at 4.  He contends that Dr. McCullough's report shows "there was no scientific support for mandating vaccination or denying exemptions," so "the prudence and reasonableness of the Bank's decision to mandate vaccination and deny exemptions based on available scientific literature falls within the scope of Dr. McCullough's expertise."  *Id.* at 5–6.

On this point, the Bank's argument is persuasive. To the extent that Dr. McCullough is testifying on the medical value of vaccines, his testimony—which the Bank disputes but does not seek to exclude—should be admitted. But to the extent that he opines on the proper response of "prudent" employers, he speaks beyond his expertise. That includes the reference to "ethical and prudent employers" as well as the statements that "[e]xemptions from vaccination saved lives and should have been granted for all applications" and "[n]o one should have received any pressure, coercion, or reprisal for requesting exemption from or declining COVID-19 vaccination." ECF No. 45-1 at 15, 32–33.

## III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. When, as here, there are cross-motions for summary judgment, each side receives the benefit of this rule in response to the other side's motion. *See, e.g.*, *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). When considering the Bank's motion, the record must be viewed in the light most

31

favorable to Mr. Maki, and when considering Mr. Maki's motion, the record must be viewed in the light most favorable to the Bank. *See id.*

A

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

"To establish a prima facie case of religious discrimination [under Title VII], a plaintiff must show he (1) has a bona fide religious belief that conflicts with an employment requirement, (2) informed the employer of such conflict, and (3) suffered an adverse employment action." *Ollis v. HearthStone Homes, Inc.*, 495 F.3d 570, 575 (8th Cir. 2007) (citing *Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000) (per curiam)). Once a plaintiff makes out a prima facie case, the burden shifts to the employer to prove accommodating the employee's religious beliefs would cause an "undue hardship." *Seaworth*, 203 F.3d at 1057.

1

The Supreme Court recently clarified the "undue hardship" standard. *Groff v. DeJoy*, 600 U.S. 447, 454 (2023); *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63,

83 (1977).  To demonstrate "undue hardship," an employer must establish that the "burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."  *Groff*, 660 U.S. at 470.  District courts "must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer."  *Id.* at 470–71 (cleaned up).  Determining "whether a given accommodation would cause 'undue hardship' is a fact-intensive inquiry."  *Lee v. Seasons Hospice*, 696 F. Supp. 3d 572, 580 (D. Minn. 2023).

While leaving "the context-specific application" of the undue-hardship standard to the district courts, *Groff*, 600 U.S. at 473, the Court also believed its opinion would preserve EEOC guidance that "no undue hardship is imposed by temporary costs, voluntary shift swapping, occasional shift swapping, or administrative costs."  *Id.* at 471 (citing 29 C.F.R. § 1605.2(d)).  That guidance emerged under the lenient "more than *de minimis*" interpretation from *Hardison*—if voluntary shift swapping was not an undue hardship under the de minimis standard, it is not an undue hardship under the "substantial increased costs" standard.  *See* 29 C.F.R. § 1605.2(e)(1).

Economic expenses are prototypical costs.  In the vaccine context, for example, a film studio won summary judgment in part because it showed that accommodating a religious objection would have risked financial losses from production delays, particularly if a central cast member "became incapacitated mid-filming."  *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1135 (C.D. Cal. 2023).  Additionally, employers can consider the cumulative cost of granting many exemptions. *See, e.g.*, *Gantt v. City of North*

*Charleston*, No. 2:22-cv-04224-DCN-MHC, 2024 WL 4486184, at *10–12 (D.S.C. July 25, 2024), *report & recommendation adopted*, 2024 WL 4343708 (D.S.C. Sept. 30, 2024).

But *Groff* does not limit substantial increased costs solely to financial burdens. *See Cruz v. Bd. of Regents of Univ. of N.M.*, Civ. No. 23-986 GJF/KRS, 2024 WL 4680623, at *9 (D.N.M. Nov. 5, 2024). Some employers have shown that exempting employees from vaccination brought about health and safety risks, which were undue hardships for their businesses. *See Kizer v. St. Jude Child.'s Rsch. Hosp.*, No. 24-507, 2024 WL 4816856, at *6 (6th Cir. Nov. 18, 2024). Health concerns are especially acute for hospitals, as many patients are immunocompromised and vulnerable to COVID-19. *See Lavelle-Hayden*, 744 F. Supp. 3d at 1158–59; *Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d 164, 175–76 (E.D. Pa. Dec. 28, 2023); *Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 220–21 (N.D.N.Y. 2024); *Hall v. Sheppard Pratt Health Sys., Inc.*, 749 F. Supp. 3d 532, 546–47 (D. Md. 2024), *appeal filed*, 24-2048 (4th Cir. Oct. 21, 2024). Non-medical employers in other fields have established that health risks amounted to an undue hardship after considering undisputed evidence of the effect of vaccination on COVID-19 transmission, the inferiority of alternative safety measures, and the employee's regular close contact with other people on the job. *See Efimoff v. Port of Seattle*, No. 2:23-cv-01307-BAT, 2024 WL 4765161, at *10 (W.D. Wash. Nov. 13, 2024) (airport security officer). These considerations are consistent with pre-*Groff* EEOC guidance, which notes undue hardship may exist "where the accommodation diminishes efficiency in other jobs, infringes on other employees' job rights or benefits, impairs workplace safety, or causes coworkers to carry the accommodated employee's share of potentially hazardous or

burdensome work." U.S. EEOC Compliance Manual on Religious Discrimination, § 12-IV(B)(2) (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination; *see Groff*, 600 U.S. at 471 ("We have no reservations in saying that a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today.").

When an employer claims that health risks constitute substantial increased costs, courts consider whether alternative safety measures adequately advance the employer's mission. In *Petersen v. Snohomish Regional Fire & Rescue*, for example, firefighters argued that their employer could have accommodated their religious practices by requiring them to wear masks, maintain social distance, and undergo regularly COVID-19 testing. No. C22-1674 TSZ, 2024 WL 278973, at *6 (W.D. Wash. Jan. 25, 2024), *appeal filed*, 24-1044 (9th Cir. Feb. 27, 2024). The court found otherwise. *Id.* at *7. The employer's expert testified that masks were effective complements to vaccination, but not effective substitutes, and the court didn't identify any contrary evidence. *Id.* at *6. Social distancing was impractical, given the job requirements, and testing did not prevent spread for individuals who became infected shortly after taking a test. *Id.* at *7. But other plaintiffs have survived summary judgment on a similar analysis. For example, in *Varkonyi v. United Launch Alliance, LLC*, the employer showed that masking and physical distancing were inadequate pre-vaccine protocols, but there was still a material fact dispute whether they were inadequate to protect a workforce that was 96% vaccinated. No. 2:23-cv-00359-SB-MRW, 2024 WL 1677523, at *5 (C.D. Cal. Feb. 21, 2024). The evidence also failed to establish the financial costs of alternative safety protocols, like weekly COVID-19 testing.

*Id.*; *see Gray v. Main Line Hosps., Inc.*, 717 F. Supp. 3d 437, 448–49 (E.D. Pa. Feb. 15, 2024) (finding that dueling experts created a factual dispute whether testing and role reassignment would have adequately addressed the health risks); *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1309–10 (D. Haw. 2022) (considering "the administrative burden of testing, especially with the current shortage of test kits" and "the administrative challenges of revising schedules to reincorporate unvaccinated employees with seniority requests").

For purposes of the Bank's summary judgment motion, there is no dispute Mr. Maki has met all three elements of the prima facie case. The Bank concedes a reasonable jury could find that Mr. Maki holds a sincere religious belief that conflicted with the Bank's vaccination policy.[4] *See* ECF No. 71 ¶¶ 95–97, 109–11, 113, 115–16. Mr. Maki communicated that belief to the Bank. *See* ECF No. 58 at 144:3–145:12; ECF No. 55-4. And he suffered an adverse employment action when the Bank terminated him. *See* ECF No. 55-12 at 3–4. The issue for both parties' motions regarding Mr. Maki's Title VII claim is whether a reasonable jury could accept or reject the Bank's undue-hardship defense.

The Bank argues that accommodating Mr. Maki's beliefs would constitute an undue hardship in two ways. It claims that allowing Mr. Maki a vaccine exemption would endanger individuals on the Bank's premises, impairing the Bank's ability to fulfill its mission, and it argues that excusing Mr. Maki from required job duties would be an undue

---

[4]    In its opposition to Mr. Maki's summary judgment motion, the Bank challenges the sincerity of his religious belief, but it concedes the point for its own motion. *See* ECF No. 87 at 8–13; ECF No. 51 at 13 n.3.

hardship.  ECF No. 51 at 13–24.  Mr. Maki argues that the Bank has presented no evidence of undue hardship.  ECF No. 66 at 21–26.  A reasonable jury could accept or reject these fact-intensive contentions.

A reasonable jury could accept or reject the Bank's contention that its vaccination policy was intended to protect employees from the worst health outcomes regardless of where they might contract COVID-19.  *See* ECF No. 56 at 100:22–101:6 (stating that the primary motivation was "keeping our staff safe from the worst health outcomes"); *id.* at 106:10–107:19 (stating that preventing spread was a factor, though not the primary factor); ECF No. 51 at 17 ("[T]his close contact endangered Maki and others . . . .").  This stated justification is undermined by the fact that the Bank granted religious accommodations to several other employees, including an attorney, human-resources consultant, IT director, and business analyst.  *See* ECF Nos. 70-14 at 2; 70-68 at 1, 70-69 at 1, 70-70 at 1, 70-71 at 1.  At the same time, however, the Bank cited evidence that its accommodated employees could maintain social distance on the job.  *Compare* ECF No. 70-14 at 2 ("Accomodation [sic] is likely possible given job duties and physical workspace."), *with id.* at 1 ("Accomodation [sic] is unduly burdensome because of job duties, physical workspace, and return of people to the premises.").  Similarly, while project-based and occasional visitors were exempted, a reasonable jury could find that these individuals could maintain physical distance while on the premises.  *See* ECF No. 56 at 240:23–25 ("[T]he contractors would be quite isolated by nature of what their assignment was.").

A reasonable jury could accept or reject the Bank's contention that accommodating Mr. Maki posed an undue hardship because Mr. Maki's job functions required him to be

near others, heightening transmission risks. The record includes evidence showing that these close or near-person encounters occurred infrequently, and that scheduling and post reassignments could have minimized them. ECF No. 60 at 149:2–12 (stating that officers received between ten and twenty emergency calls each year); *id.* at 38:21–39:21 (stating that fewer people are on Bank premises during the afternoon and overnight shifts); ECF No. 71 ¶ 54 (stating that some posts were single-officer posts); *see Seasons Hospice*, 696 F. Supp. 3d at 580 ("It may be true that accommodating plaintiffs by offering religious or medical exemptions would have increased the risk to staff and patients or damaged Seasons' reputation—and it may be true that the increased risks or reputational damage would have been significant enough to create an undue hardship—but these are matters that cannot be resolved without a factual record."). The record shows the Bank modified its staffing to reduce encounters in the pandemic's early stages. ECF No. 71 ¶¶ 57–58, 150. And Mr. Maki was willing to swap shifts and knew of other officers who would have traded with him. *Id.* ¶¶ 208–09. This voluntary shift-swapping would not impose an undue hardship. *See Groff*, 600 U.S. at 471. On the other hand, the job's "essential functions," as defined by the Bank, included responding to security threats, medical emergencies, and providing first aid as needed. ECF No. 55-2 at 2. Officers were to take command at crime scenes and were authorized by law to make arrests. *Id.*; 12 U.S.C. § 248(q)(3). They were also required to wand entrants in security lines. ECF No. 55-2 at 2. The Bank cites evidence that allowing Mr. Maki not to rotate shifts "would require overhauling the current scheduling and staffing system." ECF No. 53 ¶ 4. Further, Chief Grendahl testified that

no matter which shift or post Mr. Maki worked, he would be responsible for performing his core duties.  ECF No. 60 at 37:24–38:1.

A reasonable jury could agree or disagree that alternative safety protocols existed that would have afforded identical protections and imposed negligible costs on the Bank. Prior to refusing Mr. Maki's requested accommodation, the Bank announced it would accommodate employees by allowing them to undergo weekly testing, mask, and distance themselves from others.  ECF No. 71-7 at 1–2.  These measures were acceptable to Mr. Maki.  ECF No. 71 ¶ 215.  When the Bank revoked Mr. Maki's temporary accommodation, however, it did not offer these preventive measures in lieu of vaccination.  *See* ECF No. 71-8.  The Bank argues that "[t]here is no evidence that regular testing prevented the worst health outcomes," and that testing was only effective "in combination with physical distancing."  ECF No. 99 at 3.  But the Bank hasn't provided sufficient evidence to conclude that testing would be inferior to vaccination.  Dr. Rhame does not opine about the relative merits of testing versus vaccination.  *See generally* ECF No. 45-2.  The record does not show beyond dispute that the burdens associated with testing posed an undue hardship on the Bank.  *See* ECF No. 56 at 189:11–191:9.  Reading the disputed evidence in the light most favorable to the Bank, a testing alternative would not have mitigated risks as effectively as vaccination.  The Bank adopted its policy after conversations with health experts at the University of Minnesota, the Centers for Disease Control, and the Federal Drug Administration.  ECF No. 56 at 102:11–104:3.  While the Bank admits the evidence that vaccination directly reduced transmission was mixed, *see id.* at 100:22–101:21, it had stronger reason to believe that vaccination indirectly reduced transmission by reducing the

number of infections, *see* ECF No. 70-82 at 3.   Further, available OSHA guidance supported adopting a testing policy in conjunction with masking and physical distancing—and the Bank concluded that Mr. Maki could not maintain physical distance while fulfilling all his job duties.  *See* ECF No. 69-1 at 100.

A reasonable jury could find or not find that the high vaccination rate among the Bank's employees further lessened any hardship the Bank might experience had it accommodated Mr. Maki.  The record shows that at the time the Bank revoked Mr. Maki's accommodation, roughly 97% of Bank employees had been at least partially vaccinated.[5] ECF No. 70-55.   Reading the record favorably to Mr. Maki, widespread vaccination reduced the possibility that a contagious individual would endanger others.  *See Varkonyi*, 2024 WL 1677523, at *5 (denying summary judgment to an employer when it produced evidence of pre-vaccination costs of accommodation, but "provide[d] no evidence that the same costs would be incurred when operating at a 96 percent vaccination rate").  Here, the Bank identifies less evidence than the employer did in *Varkonyi*.  Its assertion that "[t]he return of [its] 1,000+ employees to work in-person would have exponentially increased Maki's contact with other individuals" does not compel the conclusions that Mr. Maki's accommodation presented an exponential risk of harm and that the Bank would suffer undue hardship.  *See* ECF No. 51 at 19.

---

[5]   The vaccination rate among Bank employees does not tell the whole story.  Vendors and contractors with a regular, ongoing Bank presence were required to be vaccinated, but the record does not provide a vaccination rate for this population.  ECF No. 70-18 at 1. Visitors were not required to be vaccinated.  ECF No. 70-22 at 2; ECF No. 70-81 at 2.

The Bank has also not provided facts showing that the health risks it identifies cause an undue hardship as a matter of law considering the Bank's "nature, size and operating cost." *Groff*, 600 U.S. at 470–71 (quotation omitted). When courts have granted similar summary judgment motions, they have pointed to an extensive record establishing the employer's burden induced by accommodation, in line with the "context-specific application." *Groff*, 600 U.S. at 473. For example, hospitals have shown health risks to vulnerable patients constituted substantial increased costs. *See Lavelle-Hayden*, 744 F. Supp. 3d at 1158–59 ("[A]llowing staff and patients to be put at risk compromised Defendant's mission to serve the community and keep it safe."); *Bushra*, 709 F. Supp. 3d at 175–76; *Lake*, 738 F. Supp. 3d at 220–21; *Hall*, 749 F. Supp. 3d at 546–48. The record here does not support a similar conclusion.

2

Mr. Maki's motion for summary judgment on his Title VII claim begins one step earlier. For purposes of this motion, the Bank argues that Mr. Maki has not proven an absence of trial fact over the sincerity of his religious belief. ECF No. 87 at 8–13. "[T]hough courts should not inquire into validity or plausibility of a belief, courts should decide whether the beliefs are truly held and whether they are religious." *Witham v. Hershey Co.*, No. 23-cv-1563 (ECT/JFD), 2024 WL 4053028, at *5 (D. Minn. Sept. 5, 2024) (quotation omitted). There is no dispute Mr. Maki's objection is religious; the Bank argues only that his belief is not truly held. ECF No. 87 at 8–13.

In the vaccine accommodation context, courts have routinely held that the sincerity of a plaintiff's religious belief is a credibility determination for the jury to resolve. *See*

41

*Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007) ("The inquiry into the sincerity of a . . . plaintiff's religious beliefs is almost exclusively a credibility assessment, [which] can rarely be determined on summary judgment . . . ." (quoting *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1352–53 (10th Cir. 1997), *vacated in part on reh'g en banc on other grounds*, 159 F.3d 1227 (10th Cir. 1998))); *Cesare v. PACT MSO, LLC*, 736 F. Supp. 3d 93, 101 (D. Conn. 2024) ("It is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity—as opposed, of course, to the verity—of someone's religious beliefs in both the free exercise context . . . and the Title VII context." (quotation omitted)); *Cappuccio v. Cal. State Univ., Fullerton*, No. 8:23-cv-02026-FWS-DFM, 2025 WL 1115745, at *7 (C.D. Cal. Mar. 28, 2025) (denying summary judgment to defendant on grounds that whether the plaintiff held a bona fide religious belief was a credibility determination for the jury). That's true whether defendants or plaintiffs move for summary judgment. *See Scafidi v. B. Braun Med., Inc.*, 713 F. Supp. 3d 1231, 1243 (M.D. Fla. 2024) ("Credibility issues such as the sincerity of an employee's religious belief are quintessential fact questions." (quotation omitted)); *Leonhartt v. MedStar Health, Inc.*, No. 1:23-CV-01211-JRR, 2025 WL 744077, at *9 (D. Md. Mar. 7, 2025) (finding that defendant had not submitted record evidence disputing the sincerity of plaintiff's religious belief).

Mr. Maki argues that the Bank conceded the issue. ECF No. 102 at 1–2. Its accommodation response reads, "the Bank will grant your request for an accommodation from the [Vaccination] Policy based on your stated sincerely held religious belief or practice." ECF No. 71-6 at 2. "This accommodation is based on your religious belief that prevents you from receiving a vaccine that uses of [sic] fetal cell lines in vaccine testing

and/or production." *Id.* In Mr. Maki's view, the Bank recognized his sincere religious objection at the time, and now attempts to "wriggle out of its concession." ECF No. 102 at 1. For support, he cites *Bass v. T-Mobile USA, Inc.*, 726 F. Supp. 3d 749, 759 (E.D. Mich. 2024). ECF No. 102 at 2.

This is not convincing. Other courts have explained why an employer might grant an accommodation in one context without conceding the employee's sincerity in litigation. *See Hurley v. Varian Med. Sys.*, No. 23-CV-42, 2024 WL 2368438, at *5 (E.D. Wis. May 23, 2024) (reasoning that employer's accommodation "would not constitute a judicial admission such that [the employer] would be bound to it"); *cf. Hassett v. United Airlines, Inc.*, No. 23 C 14592, 2024 WL 1556300, at *4 (N.D. Ill. Apr. 10, 2024) ("[T]he fact that [the employer] approved an employee's exemption request does not mean that it has conceded for purposes of litigation that it was aware that its employment practices conflicted with that employee's sincerely held religious beliefs."). As the *Hurley* court explained, employers are encouraged to "ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief." *Hurley*, 2024 WL 2368438, at *5 (quoting EEOC Compliance Manual § 12-I.A.3). Against these cases, *Bass* is unpersuasive. Though a summary-judgment case, it draws on Rule 12(b)(6) language. *See Bass*, 726 F. Supp. 3d at 758 ("Here, the Court finds Plaintiff has sufficiently alleged that he holds a sincere religious belief that conflicted with his employer's requirement."). Plausible allegations are not enough to show entitlement to summary judgment. *See* Fed. R. Civ. P. 56(a). And the case is factually distinguishable. The defendant in *Bass* produced no facts undermining the plaintiff's sincerity; instead, it argued that the plaintiff's claimed

43

belief was an impermissible "blanket privilege . . . for avoiding all unwanted obligations." 726 F. Supp. 3d at 758 (alteration in original) (quotation omitted). Summary judgment was warranted for the plaintiff on that issue because the defendant identified no genuine dispute over a material fact. *See id.* As will be explained, that's not the case here—the Bank has pointed to several facts that make Mr. Maki's sincerity a triable issue.

The Bank argues that Mr. Maki lacks a bona fide religious objection to the vaccination policy. ECF No. 87 at 8. It points to six sets of facts: (1) Mr. Maki received other vaccines as an adult, despite telling the Bank that he hadn't been vaccinated since childhood; (2) he intimated that his religious leaders shared his views about COVID-19 vaccines, but did not tell the Bank that his parish posted a United States Conference of Catholic Bishops' statement on its website, which explained that Catholics were not morally prohibited from receiving the vaccine; (3) at his accommodation meeting, he expressed a willingness to receive a COVID-19 vaccine that did not use fetal stem cell lines, but in his deposition, he said he was unsure he would do so because of non-religious reasons; (4) he decided not to become vaccinated against COVID-19 before learning of the vaccines' connections to fetal stem cells; (5) his "diligent research" to determine the vaccines' connection to fetal stem cells was conducted in a matter of hours; and (6) he did not inquire into the connection between fetal stem cells and other vaccines or medications. *Id.* at 8–13. Based on these facts, a reasonable jury could conclude that Mr. Maki's religious objection to the vaccination policy was not sincere.

Mr. Maki contests each of these. He argues: (1) His omission of these vaccines was an unintentional oversight. ECF No. 71 ¶¶ 172–76. (2) It is irrelevant that some

Catholics—even leaders at his own parish—held different views about the moral status of COVID-19 vaccines.  ECF No. 102 at 3–4 (citing *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901–02 (8th Cir. 2024)).  (3) Mr. Maki's apparent inconsistencies were two statements made years apart, and they implicated his non-religious beliefs in a hypothetical scenario.  *Id.* at 4–5.  (4) Mr. Maki acknowledges he had additional "concerns about [the vaccines'] healthiness," but maintains that his "belief 'reflects an honest conviction'" grounded in his faith.  *Id.* at 5 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 686 (2014)).  (5) Mr. Maki "requested the [accommodation] form 19 hours and 33 minutes after the Bank's announcement—plenty of time for him to begin his research that night." *Id.* at 5.  (6) The Bank misstates the record: Mr. Maki did investigate all the medications he was taking for connections to fetal stem cells in July 2021.  *Id.* at 6.

These arguments help to show why the issue is trial-worthy.  The Bank's evidence challenges Mr. Maki's credibility.  Several of the statements implicate his forthrightness. Mr. Maki said he had received vaccines only in childhood, when he had been vaccinated multiple times as an adult.  ECF No. 92-1 at 6:03–28; ECF No. 55-5 at 4.  That omission could be innocent or dishonest, but that is an issue for a jury to decide.  There is also a factual dispute over Mr. Maki's honesty when asked whether his parish or religious leaders had provided guidance about receiving COVID-19 vaccines.  He explained that his leaders were "pro-life" and discussed the connection between vaccines and fetal stem cells, but did not say that his parish website hosted a statement from the Conference of Bishops explaining that Catholics were morally permitted to receive COVID-19 vaccines.  ECF No. 92-1 at 4:40–5:22; *see* ECF No. 92-2.  To be sure, Mr. Maki is correct that his beliefs need

not be universally accepted by fellow practitioners to be sincere. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981). Courts are not allowed to question the truth of religious beliefs, *see United States v. Seeger*, 380 U.S. 163, 184 (1965), and it is of absolutely no consequence that other Catholics—even bishops—hold different views about vaccination, *see Ringhofer*, 102 F.4th at 901–02; *Gillette v. United States*, 401 U.S. 437, 457 (1971). What matters is that a reasonable jury could find that Mr. Maki's omission undermines his credibility and that his belief is insincere. Other evidence goes to Mr. Maki's alternative motivations to avoid vaccination. Prior to the Bank's announcement of the vaccination policy, Mr. Maki identified non-religious reasons for vaccine hesitancy, including their "experimental" status and his good health. ECF No. 70-43 at 129:21–130:15, 131:3–7. Only after the Bank announced the policy did he research the connection between the COVID-19 vaccine and fetal stem cells. *Id.* at 136:4–24. And he requested a religious accommodation within hours of the vaccination policy's commencement. *See* ECF No. 71 ¶¶ 136–37. This timing raises the reasonable inference that non-religious motivations alone prompted Mr. Maki's accommodation request.

B

RFRA requires that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). An exception exists if the application of the burden satisfies strict scrutiny, that is, if it "is in furtherance of a compelling governmental interest" and it "is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b). "Government" includes "a branch, department, agency, instrumentality, and official (or

other person acting under color of law) of the United States."[6]  *Id.* § 2000bb-2(1).  The statute "applies to all Federal law, and the implementation of that law, whether statutory or otherwise."  *Id.* § 2000bb-3(a).

The Bank's position is straightforward.  According to the Bank, binding Eighth Circuit precedent prevents Mr. Maki from bringing a RFRA claim.  ECF No. 51 at 24–25.  In *Harrell v. Donahue*, the court held that a RFRA claim against the U.S. Postal Service was "barred because Title VII provides the exclusive remedy" for the plaintiff's religious discrimination claims.  638 F.3d 975, 984 (8th Cir. 2011).  Since RFRA was not intended to expand the remedies available under Title VII, it is not the proper vehicle for an employment discrimination claim against the federal government.  *See id.*; *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976) (holding that "§ 717 of the Civil Rights Act of

---

[6]    Mr. Maki argues that the Bank is an "instrumentality" of the federal government and therefore subject to RFRA.  ECF No. 66 at 26 (citing *Gardner-Alfred v. Fed. Rsrv. Bank of N.Y.*, 651 F. Supp. 3d 695, 708 (S.D.N.Y. 2023)).  This position has support.  *See U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425–26 (1928) ("Instrumentalities like the national banks or the federal reserve banks, in which there are private interests, are not departments of the government."); *Fed. Rsrv. Bank of St. Louis v. Metrocentre Improvement Dist. No. 1*, 657 F.2d 183, 186 (8th Cir. 1981) ("In light of the important governmental functions performed by the federal reserve banks and the United States Supreme Court's willingness to hold that financial institutions performing even fewer governmental functions are federal instrumentalities, we hold that the federal reserve banks are instrumentalities of the federal government."); *Fasano v. Fed. Rsrv. Bank of N.Y.*, 457 F.3d 274, 281 n.6 (3d Cir. 2006) (collecting Circuit Court decisions finding that Federal Reserve Banks are instrumentalities of the federal government).

1964, as amended, provides the exclusive judicial remedy for claims of discrimination in

federal employment"); *Francis v. Mineta*, 505 F.3d 266, 270 (3d Cir. 2007).

Mr. Maki's response is that the Bank is not a federal employer for purposes of Title

VII, so *Brown* and *Harrell* do not apply to it.  ECF No. 86 at 40.  This argument comes

from *Gardner-Alfred v. Federal Reserve Bank of New York*, 651 F. Supp. 3d 695, 702–11

(S.D.N.Y. 2023).  There, the court explained that Title VII came into existence with the

passage of the Civil Rights Act of 1964, and at that time, it was not settled whether Title

VII applied to federal employers or only private employers.  To clarify the question,

Congress in 1972 amended Title VII and added § 717, codified at 42 U.S.C. § 2000e-16.

That provision prohibits discrimination in military departments, executive agencies, the

U.S. Postal Service, the Government Publishing Office, the Government Accountability

Office, the Library of Congress, and a handful of other entities.  42 U.S.C. § 2000e-16(a).

The Federal Reserve Banks are not on the § 717 list.  And it is with respect to the 1972

amendment that the *Brown* Court held Title VII was the exclusive vehicle for employment

discrimination claims.  *See Gardner-Alfred*, 651 F. Supp. 3d at 703.  But claims brought

under the private employer category of Title VII, 42 U.S.C. § 2000e-2, are not subject to

the same exclusivity requirement.  *See Johnson v. Ry. Express Agency*, 421 U.S. 454, 459

(1975) ("The legislative history of Title VII manifests a congressional intent to allow an

individual to pursue independently his rights under both Title VII and other applicable state

and federal statutes." (quotation omitted)).

Mr. Maki brings his claim under the original provisions of Title VII, not the 1972

amendment.  ECF No. 1 ¶ 9 (citing 42 U.S.C. § 2000e-2); *see Cooper v. Fed. Rsrv. Bank*

*of Richmond*, 467 U.S. 867, 874 (1984) (hearing Title VII claim against Federal Reserve branch as a private employer).  In the other cases where Title VII barred a RFRA claim, the defendant entity was covered by the 1972 amendment.  *See Harrell*, 638 F.3d at 984 (U.S. Postal Service); *Francis*, 505 F.3d at 268 & n.2 (Department of Homeland Security). Relying on *Gardner-Alfred*, Mr. Maki argues he can bring a Title VII claim against the Bank in its role as a private employer, and a RFRA claim against the Bank in its role as a government instrumentality.  *See* ECF No. 86 at 40–41.

The better answer is that *Harrell* controls.  *Harrell* makes no distinction between the private and government employer provisions of Title VII.  Instead, it quotes the broad language from *Brown*, that "the Civil Rights Act of 1964, as amended, provides the exclusive remedy for claims of discrimination in federal employment." *Harrell*, 638 F.3d at 983 (quoting *Brown*, 425 U.S. at 835).  Drawing from RFRA's history and purpose, *Harrell* concludes that the statute "was not intended to broaden the remedies for federal employment discrimination beyond those that already existed under Title VII." *Id.* at 984. RFRA was enacted to overturn *Employment Division v. Smith*, 494 U.S. 872 (1990), and the House and Senate Reports "unequivocally state that RFRA was not intended to affect religious accommodation under Title VII." *Harrell*, 638 F.3d at 983.  Courts should apply the law as it existed before *Smith*, under which Title VII was the exclusive vehicle to assert a religious discrimination claim against federal employers.  *See Francis*, 505 F.3d at 270 ("Nothing in pre-*Smith* case law permitted an employee alleging employment discrimination based on religion to bypass Title VII's exclusive and comprehensive scheme.").  It makes no difference whether Mr. Maki seeks recovery under the 1964 Civil

Rights Act or the 1972 amendment—either way, he seeks relief under Title VII for his federal employment discrimination claim. Like the action in *Harrell*, Mr. Maki's "claims under RFRA are barred because Title VII provides the exclusive remedy for his claims of religious discrimination." *Harrell*, 638 F.3d at 984. Summary judgment will be entered against this claim.

If the law permitted Mr. Maki to assert a RFRA claim, there is another problem. The Bank argues that RFRA does not apply to the Bank's decision to terminate Mr. Maki, as federal employment decisions are not "Federal law" or "implementation of law." *See* ECF No. 51 at 26. The Bank cites *Engquist v. Oregon Department of Agriculture* for this proposition, but that case did not interpret RFRA. *See* 553 U.S. 591, 598 (2008) ("We have long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation." (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 896 (1961))).

It is difficult to understand how the Bank's decision not to accommodate Mr. Maki might be considered "Federal law" or "implementation of law" under these authorities. Mr. Maki cites three cases for the proposition that RFRA governs federal employment decisions—*Gardner-Alfred* and two military decisions—but these cases don't justify that conclusion. ECF No. 86 at 41–42. *Gardner-Alfred* merely states that RFRA is an expansive statute and does not address whether federal employment decisions are "Federal law [or] the implementation of that law." 651 F. Supp. 3d at 708 (quoting 42 U.S.C. § 2000bb-3(a)). The military decisions are distinguishable. Both address a vaccine

mandate issued by the Department of Defense and their respective branches at the direction of the President.  *See U.S. Navy Seals 1–26 v. Biden*, 27 F.4th 336, 339 (5th Cir. 2022); *Navy Seal 1 v. Austin*, 586 F. Supp. 3d 1180, 1183 (M.D. Fla. 2022) (discussing same mandate), *inj. terminated by Colonel Fin. Mgmt. Officer v. Austin*, Nos. 8:22-cv-1275-SDM-TGW, 8:21-cv-2429-SDM-TGW, 2023 WL 6557806 (M.D. Fla. May 17, 2023).  A military vaccine mandate issued at the President's direction implements federal law for RFRA's purposes.  *Doster v. Kendall*, 54 F.4th 398, 413 (6th Cir. 2022) ("[RFRA] thus reaches the [military's] vaccine mandate, which 'imple ments' federal law."), *cert. granted and j. vacated as moot*, 144 S. Ct. 481 (2023) (Mem.).

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Defendant Federal Reserve Bank of Minneapolis's Motion for Summary Judgment [ECF No. 49] is **GRANTED** as to Count I and **DENIED** as to Count II.

2.    Plaintiff Rodney Maki's Motion for Summary Judgment [ECF No. 65] is **DENIED**.

3.    Defendant Federal Reserve Bank of Minneapolis's Motion to Exclude Expert Testimony [ECF No. 42] is **GRANTED**.

4.    Plaintiff Rodney Maki's Motion to Exclude Expert Testimony [ECF No. 74] is **GRANTED IN PART** and **DENIED IN PART** as explained above.

Dated:  May 21, 2025                          s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court